IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL R. ROMERO | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-15-3152 |
| DR. JASON CLEM,  NANCY BEALER, | * | |
| DR. MAHBOOB ASHRAF, JANE DOE #1, | * | |
| CORIZON MEDICAL CO. RN DIANA BAKER, | * | |
| WEXFORD MEDICAL CO., LT. MURPHY and | * | |
| WARDEN KATHLEEN GREEN | * | |
| Defendants | * | |

***

## MEMORANDUM OPINION

Defendants Mahboob Ashraf, Nancy Bealer and Jason Clem filed a Motion to Dismiss or for Summary Judgment (ECF No. 17) which was later incorporated by reference into Defendant Diana Baker's Motion to Dismiss or for Summary Judgment (ECF No. 29). Plaintiff opposes both motions (ECF Nos. 27 and 31). Defendants additionally move to seal medical records filed as an exhibit (ECF No. 18). The Motion to Seal shall be granted in part and the Clerk will be directed to restrict access to the parties in this case. Also pending is Plaintiff's Motion for Service of Complaint (ECF No. 26) seeking service of the amended complaint on Defendants Lt. Murphy and Kathleen Green. The motion shall be granted in the separate Order that accompanies this Memorandum Opinion. No hearing is currently required (*see* Local Rule 105.6 (D. Md. 2016)). For the reasons stated below, Defendants' Motions to Dismiss or for Summary Judgment, construed as Motions for Summary Judgment, shall be denied.

**Background**

The original complaint was filed in the Circuit Court for Somerset County, Maryland and Defendant Nancy Bealer removed the case to this court. Plaintiff Michael Romero ("Romero") is a prisoner who is currently confined at Eastern Correctional Institution (ECI), a Maryland Division of Correction facility. In the original complaint, Romero stated that on April 16, 2014, he was transferred from Maryland Correctional Institution Jessup ("MCIJ") to ECI and upon arriving advised the medical staff that a settlement agreement requires his assignment to a bottom bunk. ECF No. 2 at p. 1, citing *Romero v. Barnett et al.*, Civil No. DKC-09-2371 (D. Md.) *see also* ECF No. 2-1 (Settlement Agreement). Romero characterized the settlement agreement as a "Federal Court Order" and further alleges that he advised that he has had two right knee operations recently. ECF No. 2 at p. 1.[1]

Romero was advised by security staff that medical staff is responsible for making medical housing assignments. Despite being informed about his need for a bottom bunk assignment, Romero claims the intake nurse ("RN Ellen") refused to look at the order and refused to read any documents Romero attempted to present to her for review. *See* ECF No. 2-2 at p. 1 (permanent medical assignment to bottom bunk due to right knee damage dated January 13, 2012). Rather, Ellen advised that Romero would have to be seen by a provider to receive an assignment for a bottom bunk because she did not have the authority to do so. ECF No. 2 at p. 2.

When Romero arrived to the Housing Unit, he was assigned to a top bunk. Romero informed security staff that he could not be assigned to a top bunk due to medical reasons. He states that he was then threatened that if he did not use the top bunk he would be issued an infraction and put into disciplinary segregation for refusing housing. ECF No. 2 at p. 2.

---

[1] Plaintiff filed an Amended Complaint on January 6, 2016, ECF No. 16. There do not appear to be any material changes in the allegations against the medical defendants whose motions refer exclusively to the original complaint.

Romero wrote letters to Defendants Jason Clem and Nancy Bealer expressing his urgent need to see the provider so that he could be assigned to a bottom bunk and submitted sick call slips seeking an appointment with a provider. Romero claims that Defendants took no corrective action upon receipt of his letters and sick call slips. ECF No. 2 at p. 2.

Romero explains that his cell had a plastic chair in it to assist in reaching the top bunk and that the floor of the cell is cement. He states that on May 12, 2014 he was attempting to lift himself to the top bunk when the bed moved and his left shoulder buckled. In order to prevent his shoulder from dislocating, he had to let his body drop. When he did so, Romero landed on the plastic chair which slid out from underneath him and caused him to twist his right knee, tearing the repaired ligament in his knee. Romero states that he had just received a medical pass to see a provider, so he did not call security for emergency attention because he knew they would be there soon to escort him to be seen for the medical pass. ECF No. 2 at p. 2.

Romero states that he limped into the medical unit and was seen by Defendant Dr. Ashraf. He claims that Ashraf ordered a cane to assist him with walking, but refused to order a bottom bunk assignment because it was not necessary. Romero claims that Ashraf told him to tell the chronic care nurse to issue him a cane and that Ashraf would sign the order. Romero followed the directive, but claims that when he told the nurse, who he now identifies as Diana Baker (*see* ECF No. 16 at p. 5), she jumped up and began yelling, "you're not getting a cane" and "you're not giving that man a cane." Romero claims that Baker walked into the office where Ashraf was located and began yelling that Ashraf should not be giving Romero a cane. Romero states that this was when Ashraf rescinded the order to issue a cane. ECF No. 2 at p. 2.

Romero claims that Baker refused to provide her name and that correctional officers ordered him to leave the area. Romero protested and explained that he had not yet completed his

3

chronic care visit, but the officers simply stated, "you're done." Romero states that he was then forced out of medical with a torn ligament on which he could barely walk, without medical care or accommodation of a cane or bottom bunk assignment. In an attempt to remedy the situation, Romero wrote an emergency grievance, but claims it was not processed as an emergency. ECF No. 2 at pp. 2 – 3.

One week later, on May 19, 2014, Romero was summoned to sick call by RN Richbark regarding his grievance. Romero states that she advised that if he would "sign off" on the grievance he would receive a cane and treatment for his injured knee. Romero states that he was placed on bed-rest for 30 days that day because of the May 12, 2014 injury. ECF No. 2 at p. 3.

In his amended complaint, Romero alleges the same claims asserted in the complaint, but adds that he also contacted Defendant Warden Kathleen Green about the failure to assign him to a bottom bunk despite the existing settlement agreement, but Green also took no corrective action. ECF No. 16 at p. 5.

He further adds that following his fall on May 12, 2014, he was forced to walk to receive his meals and obtain medication. *Id*. at p. 6.

Romero alleges that Defendant Lt. Murphy was ordered to assign him to a bottom bunk by Chief of Security Maycock on May 19, 2014. Romero claims that Murphy could have assigned him to a bottom bunk prior to receiving this order, but refused. *Id*.

Romero states that he had earlier had a second surgery on the ACL in his right knee on May 5, 2013, and that following that surgery he was walking normally and was able to stop using the cane he had been using for almost three years prior to the surgery. He claims that, as a result of the May 12, 2014 fall, the ligaments were torn again. *Id*.

Romero maintains that Defendants Clem, Bealer, Ashraf, Baker, Wexford Medical Co., Murphy and Green violated his Eighth Amendment right to remain free from cruel and unusual punishment by violating the settlement agreement and denying him emergency medical treatment. He asserts that Murphy and Green violated the Eighth Amendment when he was forced to use a bunk that was not bolted to the wall for stability and failing to provide a ladder to access the top bunk rather than a plastic chair which he describes as "like stepping on ice." ECF 16 at p. 6.

Romero also raises a Fourteenth Amendment claim against all Defendants stating that failure to honor the settlement agreement, denying emergency medical treatment, and failing to provide a stable bunk with a safe way to access it constitutes a denial of due process. *Id*. at p. 7.

As relief Romero seeks unspecified monetary damages. *Id*. at p. 4.

Defendants provide medical records establishing that Romero received arthroscopic surgery on May 30, 2013 at Bon Secours Hospital ("BSH") for partial ACL and meniscal tears related to a then recent re-injury to the right knee.[2] ECF No. 18 at Ex. 1, pp. 87 – 88. The surgery was performed by Dr. Ashok Krishnaswamy who noted that Romero tolerated the procedure well and left the operating room in good condition. *Id*.

On April 11, 2014,[3] Romero returned to BSH for a follow-up appointment with Dr. Krishnaswamy. At that time it was noted the knee was slightly tender, but that Romero demonstrated a full range of motion. ECF No. 18 at Ex. 1, pp. 89 – 95. Dr. Krishnaswamy recommended Romero wear a patellar stabilizing brace and noted Romero could sleep with a

---

[2] Defendants report the original injury occurred in 1992 and required arthroscopic surgery for the repair. ECF No. 17-2 at p. 2.

[3] Romero disputes being seen by Dr. Krishnaswamy on April 11, 2014, and claims that Dr. Clem prevented him from being sent to BSH for evaluation because it would have confirmed he sustained an injury on May 12, 2014. ECF No. 27-1 at pp. 2 – 3.

pillow between his legs while sleeping.  He further recommended that Romero return in three months for another follow-up, but did not recommend assignment to a bottom bunk or the use of a cane.  *Id.*

On April 21, 2014, when Romero was transferred to ECI, Defendants claim that he raised no medical concerns, that his medical records and current medications were reviewed, and that he was due for a follow-up appointment at BSH in July, 2014.  ECF No. 18 at Ex. 1, p. 1.  At that time, Romero was prescribed Etodolac, Ranitidine, Ultram, Neurontin, and Naphcon-A.  *Id.*  Dr. Ashraf was informed of Romero's prescriptions and the plan was for Dr. Clem to review the prescriptions on April 22, 2014.  *Id.*

On April 24, 2014, Romero submitted a sick call slip requesting to see a physician to modify his medications.  ECF No. 18 at Ex. 1, p. 144.  Defendants allege that Romero did not show up for his medical appointment two days later.  *Id.* at p. 2.

On April 28, 2014, Romero was seen by Physician's Assistant ("P.A.") Terri Davis regarding his medications. ECF No. 18 at Ex. 1, pp. 3 -4.  Davis noted that the x-rays of Romero's right knee did not show joint space narrowing or osteophytes.  Davis further noted that Dr. Krishnaswamy had recommended Naprosyn 500 mg twice per day initially, but Ultram was later added when Romero complained of continued pain.  *Id.*  Neurontin had been added on December 3, 2013, after Romero complained of back pain.  The dosage of Neurontin had been increased over a few months due to Romero's continued complaints of back pain, however, Davis noted there was no objective indication that Romero was experiencing back pain.  *Id.*  Davis also noted that Romero had reported on February 21, 2014, that he could not take Naprosyn or Motrin, but that Romero is neither allergic to those medications, nor could he provide a reason why he could not take those medications.  *Id.*  Based on this information, Davis

6

continued Romero's current prescriptions for one month until he could be re-evaluated by a physician. *Id*. In addition, Davis ordered an x-ray for Romero's lumbar spine. *Id*.

On May 5, 2014, Dr. Yonas Sisay issued a cuff-in-front order for Romero because he had received a copy of the settlement agreement between Romero and the State dated May 3, 2012, which required such an order. ECF No. 18 at Ex. 1, p. 8. The relevant portion of the agreement states:

> In consideration of the releases set forth in this Agreement, that State . . . [e]nsure that any and all medical waivers currently in place, including the handcuff-in-front order requiring all prison personnel to cuff Michael R. Romero in the front of his person as opposed to behind his back, be carried forward and fully implemented at any correctional facility that houses Michael R. Romero.

ECF No. 2-1 at pp. 1-2. The agreement emanates from Civil Action DKC-09-2371 and concerned Romero's allegation against three correctional officers who forcibly handcuffed Romero behind his back despite the existence of a "cuff-in-front" order. As a result of the disregard for the medical order, Romero's left shoulder became dislocated. *See Romero v. Barnett, et al.*, Civil Action DKC-09-2371 (D. Md.) at ECF No. 1. At the time Romero entered into the settlement agreement, a medical order existed requiring his permanent assignment to a bottom bunk. *See* ECF No. 2-2 at p. 1. Defendants correctly note that none of them were parties to the agreement, nor was it signed by any other medical provider. ECF No. 17-2 at p. 4, n. 3.

Romero was also seen by Registered Nurse Ellen Moyer on May 5, 2014, to address his complaints of chronic pain. ECF No. 18 at Ex. 1, pp. 9 – 10. Romero expressed his dissatisfaction with the fact that his medications had been decreased and requested a medical pillow, a stability pillow, and an order for bottom-bunk status. Moyer noted that Romero was very aggressive about having these issues addressed and emailed the chronic care nurse to determine when Romero's issues could be addressed. *Id*.

On May 12, 2014, Romero was seen for a chronic care appointment; nothing is mentioned in the record of that date regarding Romero's fall. ECF No. 18 at Ex. 1, p. 12. Dr. Ashraf renewed Romero's pain medications but noted Romero wanted a bottom bunk and a cane. *Id*. Ashraf notes that neither would be ordered as Romero did not need either. Ashraf further noted that Romero walked with a limping gait due to his recent surgery and that Romero's foot was mildly swollen and painful during flexion and extension. *Id*.

In a sick call slip dated May 16, 2014, Romero reports that it is his second request and that he fell trying to climb into his bunk. ECF No. 18 at Ex. 1, p. 73. He reported that he had twisted his shoulder and fell, reinjuring his right knee. *Id*.

On May 19, 2014, Romero was seen by Melissa Richbark, R.N. regarding his complaint about falling. ECF No. 18 at Ex. 1, pp. 20 – 21. Romero requested cuff-in-front status, a knee brace, bottom-bunk status, a cane, and to have his pain medications renewed. *Id*. In addition, Romero asked about his follow-up appointment at BSH. Richbark spoke with a provider about Romero's injury and his request for a cane and was advised to treat Romero's injury as a new injury so that a cane could be temporarily provided with restrictions. *Id*. After being advised of the restrictions on the cane, Romero signed for and received a cane. *Id*. Dr. Ashraf issued an order for Romero to be placed on bedrest with feed-in status for thirty days. *Id.* Ashraf extended Romero's bedrest order for another thirty days on June 19, 2014. *Id.* at p. 26.

On June 2, 2014, Defendant Nancy Bealer sent a letter to Romero regarding his requests for medical assignments. ECF No. 18 at Ex. 1, p. 23. In the letter, Bealer stated that she reviewed Dr. Krishnaswamy's recommendations and they did not include a knee brace or pillow. She recognized that Dr. Krishnaswamy's recommendation that Romero receive Neurontin and Ultram was being observed, but that the recommendation for Naproxen was not because Romero

claimed he could not take it. *Id*. Bealer further advised that the medication substituted for Naproxen, Etodolac, is contraindicated for long term use in patients like Romero who have Hepatitis C ("HCV") and also noted that it is an NSAID like Naproxen. *Id*.

On June 22, 2014, Romero was seen by Richbark for his complaints of right knee pain. ECF No. 18 at Ex. 1, pp. 27 – 28. Romero again requested bottom-bunk status, a knee stabilizer, and a pillow and informed Richbark that Bealer would "pay" for not giving him a pillow and knee brace. *Id*.

On June 27, 2014, Romero's right knee was examined by Dr. Dolph Druckman, who noted that Romero reported worsening pain in his knee since a fall from a top bunk on May 12, 2014. ECF No. 18 at Ex. 1, pp. 29 – 30. At that time Romero reported that his knee felt unstable when weight bearing and said that the cane he had been issued was helpful. *Id*. Druckman's examination noted tenderness around the right knee and ligaments, but no evidence of inflammation or bursitis was observed. Druckman recommended a stabilizing knee brace, added glucosamine chondroitin to Romero's medication, and issued a medical order for bottom bunk assignment for one year. *Id*. No clinical signs of instability in Romero's knee were noted by Druckman. *Id*.

On July 24, 2014, Ashraf noted that Romero had been seen in the BSH Orthopedics Department where an MRI was performed. *Id*. at p. 32. The MRI showed a tear of the meniscus with "possible chronic tear of the anterior cruciate ligament." *Id*. He noted that Romero was taking Tramadol (50 mg. twice per day) and Neurontin (600 mg. twice per day) for pain control. *Id*. Ashraf further notes that the doctor who saw Romero at BSH told him to return in three months and made a request for that consultation. *Id*.

On October 21, 2014, Romero returned to BSH for an orthopedic consultation with Dr. Krishnaswamy.  ECF No. 18 at Ex. 1, pp. 96 – 99.  Romero reported increased pain in his right knee following a fall when he was attempting to get into the top bunk in his cell.  *Id*.  Although Dr. Krishnaswamy had recommended Romero wear a right knee brace, he had not been fitted for one as of that date.  *Id*.  Romero's right knee was observed as tender with an increase in tenderness upon flexing and extending.  Dr. Krishnaswamy diagnosed Romero with right knee arthritis with internal derangement related to his fall and recommended a repeat MRI to determine if the meniscus was torn.  *Id*.  In addition, Dr. Krishnaswamy recommended that Romero be assigned to a bottom bunk, continue taking Tramadol, and be fitted with a knee stabilizer.  *Id*.  Romero was to return after the MRI was completed.  *Id*.

On October 30, 2014, Romero was seen by Dr. Clem for a follow-up visit.  Dr. Clem ordered the repeat MRI recommended by Dr. Krishnaswamy.  ECF No. 18 at Ex. 1, p. 42.  In addition, Dr. Clem prescribed Tramadol for Romero because he had been taken off the medication by Dr. Oyteza in September and Dr. Krishnaswamy recommended prescribing it for Romero's pain.  *See id*. at pp. 39- 40.  The knee brace recommended for Romero was not ordered because the type of brace was not specified.  *Id*. at p. 42.

Romero received the repeat MRI at Peninsula Regional Medical Center on November 5, 2014.  ECF No. 18 at Ex.1, pp. 119 – 20.  The MRI revealed osteoarthritic changes with small osteophyte formation and a tear in the medial meniscus.  *Id*.  The ACL could not be seen on the images and was presumed to be torn.  *Id*.

On November 10, 2014, Romero was fitted for and received a knee stabilizer.  *Id*. at p. 45.  Two days later Romero was seen by Dr. Oyteza and the brace was examined based on Romero's complaint that it was too tight.  *Id*. at pp. 47 – 48.  Dr. Oyteza determined that the

brace fit appropriately and noted that the November 5, 2014 MRI images would be reviewed by an orthopedist who would determine the treatment plan. *Id*.

On December 19, 2014, Dr. Clem put in a request for Romero to return to BSH for evaluation and renewed his prescription for Tramadol for thirty days. ECF No. 18 at Ex. 1, p. 51. The request was approved on January 8, 2015, and Romero returned to BSH on January 20, 2015. *Id*. at pp. 52 and 100 – 101.

Romero was examined by Dr. Krishnaswamy who determined that he would benefit from another arthroscopic surgery. *Id*. at pp. 100- 101. He further advised that Romero should continue taking Tramadol for pain and using a knee brace for stability. *Id*. Romero's medical assignments for a cane and bottom bunk status were renewed for another year on April 24, 2015. *Id*. at pp. 53 – 55. The surgery was approved on May 27, 2015 (*id*. at p. 58) and performed on July 7, 2015 (*id*. at p. 61).

Defendant Diana Baker avers in an affidavit that she is a licensed practical nurse at ECI and does not have the authority to approve or deny medical assignments including whether an inmate should be provided with a cane. ECF No. 29 at Ex. 1. She further states that she would "never attempt to change the clinical decision of a physician" and denies attempting to convince Dr. Ashraf to deny Romero a cane. *Id*. She claims that it was Dr. Ashraf's medical decision to deny Romero's request for a cane on May 12, 2014. *Id*.

## Standard of Review

### Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

<u>Eighth Amendment</u>

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the

defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the

defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

**Analysis**

Included with Romero's Opposition Response is his declaration under oath confirming the allegations contained in the complaint (ECF No. 27-1), a portion of a transcript from an Inmate Grievance Office ("IGO") hearing (ECF No. 27-1 at p. 5), and the final decision of the IGO finding Romero's complaint meritorious and awarding $500 in damages (ECF No. 27-2). The medical Defendants were not a party to the IGO proceedings, however, it was asserted by the representative for ECI that an order for a bottom bunk assignment must be made by medical personnel. ECF No. 27-1 at p. 5. The administrative law judge found that prison staff violated the settlement agreement Romero entered into with Division of Correction personnel when the medical order for bottom bunk assignment in existence at the time the agreement was made was not honored. ECF No. 27-2 at p. 7. Additionally, the decision observes that "assignment to an upper bunk placed [Romero] at increased risk of injury" and that '[s]ince the fall occurred when he was attempting to access the upper bunk . . . it was the result of the DOC's unlawful failure to honor the term of the Settlement, as well as the prior medical order for a bottom bunk." *Id*.

Defendants maintain that Romero's fall was caused by the bunk moving when he was attempting to get into it, and not because of the condition of his knee. ECF Nos. 17 and 28. This assertion does not address Romero's claim that an existing medical order requiring his permanent assignment to a bottom bunk was ignored by medical staff despite the well-documented issues with his knee. This is a genuine dispute of material fact precluding summary judgment in favor of Defendants. Romero's persistent claim has been that he informed medical

14

staff that he required a bottom bunk and he was denied same. There is nothing in the record currently before the court that would support the conclusion that the fall suffered by Romero was not reasonably foreseeable given his long history with a shoulder injury and right knee damage.

Romero also avers under oath that he informed Dr. Ashraf of his fall on May 12, 2014, and requested a cane to assist him with walking. ECF No. 27-1, pp. 1-2. His claim is partially supported by the record evidence inasmuch as the encounter with Dr. Ashraf notes that Romero was limping, his foot was swollen, and he was requesting a cane, observations which had not been made previously. The record does not note that Romero had fallen, however prior requests made by Romero did not include a request for a cane. Defendants' assertion that Romero's claim is a matter of simply disagreeing with medical decisions made is inapplicable where, as here, the claim is that an injury was left untreated for one week. There is a genuine dispute of material fact regarding when Dr. Ashraf[4] was notified of the injury and a credibility determination is required regarding Diana Baker's role in the failure to provide Romero with a cane.

Romero also avers under oath that Nancy Bealer was contacted several times regarding his ongoing care for his knee pain. ECF No. 27-1 at p. 2. In Bealer's June 2, 2014 letter to Romero she denied that Dr. Krishnaswamy recommended the use of a medical pillow or a knee brace. ECF No. 18 at Ex. 1, p. 23. This assertion is contradicted by the record. In Dr. Krishnaswamy's progress note dated April 11, 2014, he states that Romero should wear a patella stabilizing knee brace and also use a pillow between his legs when sleeping. ECF No. 18 at Ex. 1, p. 89. There is a genuine dispute of material fact regarding Bealer's knowledge of those recommendations and the rationale for either ignoring them or failing to ascertain if they were in fact recommended.

---

[4] The record does not include an affidavit from Defendants Ashraf or Bealer.

Romero's claim against Dr. Clem is also based on both Dr. Clem's status as the medical director for ECI and his knowledge of Romero's injury. ECF No. 27-1 at p. 2. Romero asserts that Dr. Clem is responsible for delaying the treatment for his right knee injury following his fall. *Id*. The record evidence, however, supports Dr. Clem's assertion that Romero's injury was appropriately addressed from May 19, 2014, forward. Romero was given a cane, bottom bunk assignment and pain medication and was also sent to BSH for evaluation and, ultimately, surgery to his knee. Dr. Clem's claim that Romero did not medically require a bottom bunk assignment prior to May 12, 2014, is disputed both by Romero and portions of the record. The permanent medical assignment to bottom bunk status based on the damage to Romero's right knee that was issued in January of 2012 is not addressed by Defendants. It is undisputed that on May 5, 2014, the settlement agreement stating that all existing medical orders would be maintained was provided to Dr. Yonas Sisay. ECF No. 17-3 at pp. 3 – 4. The only action taken in response to that information was to issue a cuff-in-front order for Romero. *Id*. Whether the medical order for permanent bottom bunk assignment was simply ignored or a medical reassessment of Romero's need for that assignment took place is a genuine dispute of material fact precluding summary judgment in favor of Dr. Clem.

The Motion to Dismiss or for Summary Judgment shall be denied. Service of the amended complaint on Defendants Warden Kathleen Green and Lt. Murphy shall go forward. Romero is reminded that if he desires appointed counsel to represent him in this matter he may file a Motion to Appoint Counsel. A separate Order follows.

  August 15, 2016             _____/s/_____
Date                      DEBORAH K. CHASANOW
                                     United States District Judge